**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

STEPHEN RAAB,

      Plaintiff,

      v.                                  Civ. No. 22-920 SCY-JMR

CARBONBUILT, INC.,

      Defendant.

**MEMORANDUM OPINION AND ORDER**
**GRANTING SUMMARY JUDGMENT[1]**

    This lawsuit involves a falling out between Plaintiff Stephen Raab and Defendant Carbonbuilt, Inc.—a company Plaintiff helped found and for which he previously worked. Plaintiff contends: (1) Defendant owes him for work he performed from November 2018 through October 2020; and (2) in issuing new stock and thereby diluting the founders' equity, Defendant breached its promise, made before the company incorporated, to give Plaintiff an 8.25% equity share of the company. Defendant moves for summary judgment, arguing: (1) Plaintiff previously released all claims he might have against Defendant that arose before June 1, 2021; and (2) Defendant never made an enforceable promise not to dilute Plaintiff's 8.25% equity share. The Court finds that Plaintiff has not met his burden on summary judgment to put forth evidence on which he could prevail at trial on his contract or his equitable claims. Therefore, the Court GRANTS Defendant's motion for summary judgment.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct all proceedings and to enter an order of judgment. Docs. 11, 12, & 13.

## FACTS

The facts are taken from Defendant's Statement of Undisputed Material Facts ("UMF"), Doc. 29 at 6-13, and are undisputed unless indicated otherwise. The Court views the facts in the light most favorable to the non-moving party, Plaintiff.

A.    The UCLA Tech

Beginning in 2014, Dr. Gaurav Sant, a professor of civil and environmental engineering and materials science and engineering at the University of California Los Angeles ("UCLA"), began developing technology to be used for lowering carbon emissions in the production of concrete (the "UCLA Tech"). UMF ¶ 1. The UCLA Tech has always been, and remains, the exclusive intellectual property of UCLA. UMF ¶ 2. Development of the UCLA Tech took a significant investment of time by Sant's team of researchers, postdoctoral fellows, and graduate students at UCLA. UMF ¶ 3. In April 2016, UCLA submitted the UCLA Tech to be considered for an award of the NRG COSIA Carbon XPRIZE ("XPRIZE"), a global competition for carbon renewal technologies. UMF ¶ 4. Submission to and consideration for the XPRIZE is a multi-year process which required a significant investment of time and energy by Sant and his team at UCLA. UMF ¶ 7. Plaintiff was not involved in the conception or development of the UCLA Tech in any way. UMF ¶ 5. He did not participate in the initial submission process to the XPRIZE. UMF ¶ 6.

In December 2017, Sant met with Plaintiff to discuss assisting with the testing phase of the UCLA Tech. UMF ¶ 8. Plaintiff participated in the testing of the UCLA Tech from February 2018 to early 2021. UMF ¶ 9. In response to a request for admission, Plaintiff admitted he "received compensation for [his] work on the project" (and defines the "project" as "the project being developed at the University of California, Los Angeles that would use carbon dioxide emissions to produce concrete, as described in Paragraph 5 of the Complaint"). UMF ¶ 10; Doc.

29-1 at 46; Doc. 29-1 at 40; Doc. 1-1 at 5 ¶ 5. In a declaration attached to his opposition to the motion for summary judgment, however, Plaintiff states he received compensation for seven months of work only (from November 2020 to June 2021) and received no payment for his work from February 2018 to November 2020 (33 months). Doc. 40-1 ¶ 18.[2]

Plaintiff and Sant discussed that, at some point in the future, a company could be formed to hopefully license the UCLA Tech for commercial use. UMF ¶ 11. Plaintiff and Sant discussed that they, and certain others, would be issued stock in a future company to compensate them for their work related to the UCLA project. UMF ¶ 12. Sant, other co-founders, and UCLA marketing materials sometimes referred to the UCLA project as CO2Concrete. UMF ¶¶ 13-14. The reference to CO2Concrete was not to an existing entity (because no such entity had been formed). UMF ¶ 15. Instead, the use of CO2Concrete reflected what the UCLA Tech was intended to accomplish. UMF ¶ 16.

In August 2018, Plaintiff formed a limited liability company called CO2Concrete, LLC. UMF ¶ 17. Plaintiff was the only member of the limited liability company he formed. UMF ¶ 18.[3] In November 2019, Plaintiff circulated a draft partnership agreement relating to CO2Concrete, LLC, but none of the other co-founders identified in the partnership agreement executed it or operated under it. UMF ¶ 20; Doc. 40-1 ¶ 6. CO2Concrete LLC never acquired any rights to the UCLA Tech. UMF ¶ 19.

---

[2] Neither party addresses whether Plaintiff should be permitted to modify an admission in this manner. Because the Court finds that Plaintiff does not meet his burden to support his claim for compensation from February 2018 to November 2020, it need not address this issue.

[3] Plaintiff does not dispute UMF ¶ 18. Doc. 40 at 2. However, he later asserts: "The members of the company were me, Dr. Sant, Mr. Muller, and James McDermott." Doc. 40-1 ¶ 9 (Plaintiff declaration). Sant, for his part, avers that, "The other Co-founders and I were contemplating joining CO2Concrete, LLC as members, but this was never formalized." Doc. 29-2 ¶ 6 (Sant declaration). To the extent this is a dispute of fact, the Court finds it immaterial.

B.     The December 2019 email

On December 2, 2019, Sant sent an email (the "December 2019 Email") to Ed Muller.

Doc. 29-2 at 5-6. Because this email is central to the present dispute, the Court will quote it in

full rather than accepting either party's characterization of its language.

> Hi Ed: As discussed earlier, please see below my initial thoughts around
> CO2Concrete's equity distributions.
>
> A few guiding principles regarding the distributions at this time (i.e., before we
> secure our first "cash" infusion):
> **a) Single-class of shares and equity**: Everyone has similar shares and a vote that
> is simply reflective of their equity position. In other words, for now, we only have
> common stock, and there are no preferred shares.
> **b) Sign-off prior to sale or transfer**: Any sale or transfer of equity requires the
> sign-off of the group. I would ideally prefer a vesting period, to maintain
> everyone's attention and interest for 2-to-3 years but I do not think this is realistic
> (at this time).
> **c) Equivalent reductions following cash infusion**: Following a cash infusion
> (i.e., securing dilutive funding), everyone takes an equivalent reduction in equity,
> i.e., in proportion to their pre-dilutive funding equity holding, and the equity that
> is surrendered to the investor.
> **d) Redistribution of "strategic pool" equity**: If this equity remains unsubscribed
> leading up to our first dilutive fundraise, we will return (reward) a portion of it to
> (#2-#3) below in proportion to their original holding.
> **e) Board positions**: You and I will both have voting board seats with me having
> the right to name one additional (voting) board member that for reasons of
> credibility, networks, or competence would be advantageous for us to appoint to
> the board. This one is less important for now, but we should discuss this in detail
> before we secure dilutive funding.
>
> That said, my proposal for equity distributions is as follows:
>
> **1) 17.5% "strategic pool" equity [17.5%]**: This pool equity will be used to
> strategically incentivize new personnel additions, potential EPC partners, and
> desirable board members in the pre-dilutive fund raise phase.
>
> 2) **Core team equity [24.75%]**: This equity will be offered to the current core-
> team including Gabriel, Iman, and Steve in the amount of 8.25% each, and,
>
> **3) Founders equity [57.75%]**: This is equity that will be held, and that I
> anticipate will be, at least initially, jointly administered by you and I. My initial
> estimate is that you will secure some of this equity in a manner that we are
> mutually agreeable. While we could carve out equity for you from (#1), I think it

would be more appropriate for your equity distribution to originate from the Founder's equity.

Please do let me know what you think, and once we agree on a broad basis, I can circulate it to the group for their consideration.

Doc. 29-2 at 5-6. That same day, Sant forwarded the email to Plaintiff, noting: "Hi Steve: Please see below. I shared this with Ed yesterday. Please do share your feedback with us." Doc. 29-2 at 5.

Defendant contends this email was "just a proposal," UMF ¶ 24, while Plaintiff argues that he "continued working to commercialize the technology on the strength of the promise that he would be given an equity stake as high as 8.25% in whatever company was used for such commercialization." Doc. 40 at 3. Either way, the parties agree the email itself consisted of "initial thoughts" and contained no binding language or signatures. UMF ¶ 25c. Further, even at this early stage, the co-founders, including Plaintiff, were aware that initial equity interests in some company that may be formed in the future would be diluted by future investors and potentially others who were granted shares. UMF ¶ 26.

    C.    <u>CarbonBuilt</u>

On November 4, 2020, Rahul Shendure, at Sant's direction, formed a corporation named Bruin Industries, Inc. to potentially license the UCLA Tech in the future for commercial purposes. UMF ¶¶ 27-28. On January 27, 2021, Bruin Industries, Inc. changed its name to CarbonBuilt, Inc. UMF ¶ 29. CarbonBuilt (previously Bruin Industries, Inc.) has always been a Delaware corporation and has never been any other type of entity or known by any other name(s). UMF ¶ 30. Plaintiff's CO2Concrete, LLC is not a parent, subsidiary, or predecessor of CarbonBuilt; the two companies are separate entities. UMF ¶¶ 31, 32. Plaintiff does not dispute this fact regarding the formal corporate relationship between the two entities. He contends, however, that "CO2Concrete was the public-facing entity through which the technology was

initially commercialized" and "[i]n 2021, the decision was made to rebrand the company as CarbonBuilt and CarbonBuilt issued a press release to that effect." Doc. 40 at 4; Doc. 40-1 at 20-21.

On November 30, 2020, Defendant awarded certain restricted stock to the co-founders, including Plaintiff; these shares were intended to serve as compensation for the co-founders' participation in early work on the UCLA project which ultimately inured to Defendant's benefit. UMF ¶ 33. Like all other shareholders who were granted stock in CarbonBuilt early in the company's history, Plaintiff executed a Restricted Stock Purchase Agreement ("RSPA"). UMF ¶ 34. Plaintiff was granted 606,874 shares of common stock of CarbonBuilt representing 8.42% of the company at that time, subject to a vesting schedule, which provided that his shares would vest over a period of time, not all at once. UMF¶ 35. Of these, 202,291 shares vested immediately upon Plaintiff's execution of the RSPA; the remaining 404,583 shares would not vest until at least one year later. UMF ¶ 36. At its option, Defendant could repurchase any shares that had not yet vested if Plaintiff was terminated at any time. UMF ¶ 37. Plaintiff agreed and understood that if he ceased to be employed by Defendant, he would not be entitled to any remaining unvested shares. UMF ¶ 38. Whether Plaintiff continued to be employed by Defendant would be determined at the "sole discretion" of the Board of Directors of the company. UMF ¶ 39.

In April 2021, UCLA won the XPRIZE competition and received a $7.5 million cash prize based on its submission of the UCLA Tech, all of which was awarded directly to the Regents of UCLA. UMF ¶ 43. Defendant did not receive any portion of the funds awarded to UCLA in connection with the XPRIZE competition. UMF ¶ 44. On April 19, 2021, Defendant secured an option from UCLA to exclusively license the UCLA Tech for commercial use via a

confidential Evaluation License & Option Agreement. UMF ¶ 47. CO2Concrete, LLC is not a party to the Option Agreement or the License. UMF ¶ 48.

In the summer of 2021, Defendant sought to obtain investors to assist the company with its cash flow for future operations via a Series A equity financing round. UMF ¶ 45. In connection therewith, Defendant secured an option to exclusively license the UCLA Tech for commercial use, formalized its employment agreements with certain co-founders, solidified its relationships with members of the Board of Directors, and negotiated other changes to Company finances and operations at the request of various investors. UMF ¶ 46. On May 10, 2021, Defendant created an employee stock incentive pool to recruit employees for the company. UMF ¶ 49. The creation of the employee stock incentive pool and corresponding issuance of shares was authorized by Defendant. UMF ¶ 50. Plaintiff executed a stockholder consent to the creation of the employee stock incentive pool and corresponding issuance of shares. UMF ¶ 51. Plaintiff's percentage equity interest in CarbonBuilt was diluted by issuance of shares for the employee stock incentive pool. UMF ¶ 52. The percentage equity interests of the existing shareholders of CarbonBuilt were diluted proportionately upon issuance of the shares for the employee stock incentive pool. UMF ¶ 53. Plaintiff does not dispute that his shares were diluted by creation of the employee stock incentive pool but does dispute that he willingly agreed to such dilution. Doc. 40 at 6; *see* Doc. 40-1 ¶ 15 (Raab decl.) ("I was simply given a document to sign signaling my agreement to the creation of the stock incentive pool in the specific manner Mr. Shendure had decided to structure it. I did not believe I had any choice in the matter.").

D.    Employment contract

On May 19, 2021, Plaintiff executed an Offer Letter setting forth the terms and conditions of his "at-will" employment by Defendant, with a June 1, 2021 "Start Date." UMF ¶

54.[4] UMF ¶ 55. The Employment Agreement states that Plaintiff would receive a $130,000 annual salary in two parts—$65,000 to be paid at regular intervals and the remaining $65,000 to be paid upon Defendant's closing of at least $5 million of equity financing by one or more third-party investors. UMF ¶ 56. Plaintiff's Employment Agreement contains the following release:

> [Plaintiff] hereby release[s] and forever discharge[s] and agree[s] to hold harmless [Defendant] from any and all demands, claims, duties, actions, obligations or causes of action, assessments, losses, damages, liabilities, costs and expenses (including attorneys' fees) of any kind, nature or description (including, without limitation, any claim of unpaid wages, salary, bonuses or fees for services rendered), interest, penalties, whether known or unknown, suspected or unsuspected, fixed or contingent that [Plaintiff has] or may have, now or in the future, against [Defendant] arising out of, based upon or in any way related to [his] service to [Defendant] or otherwise relating to [his] role or status with [Defendant] on or prior to the Start Date.

UMF ¶ 57. In consideration for this release and the work performed during the Pre-Employment Period, Plaintiff was paid $75,833.33. UMF ¶ 58. The Employment Agreement defines the "Pre-Employment Period" as the period from November 4, 2020 to June 1, 2021. UMF ¶ 59.

E.    Equity Dilution

In late summer 2021, Defendant ultimately secured $10 million in third-party equity financing (the "Series A Investment"), and the investors received shares of stock in CarbonBuilt, Inc. UMF ¶ 62. In order to close the Series A Investment, the investors requested that the vesting schedule with respect to the unvested shares for certain co-founders (including Plaintiff) be adjusted to spread out their vesting over a longer period of time (three years) and in smaller tranches (monthly rather than annually). UMF ¶ 63. Plaintiff executed an amendment to his RSPA (the "Amendment") on September 15, 2021, concurrent with the closing of the third-party

---

[4] The Employment Agreement was amended effective May 19, 2021. The amendment concerned the "Accrued Salary and Bonus" paragraph but did not affect the language relevant to this lawsuit. Doc. 29-3 at 46-47.

equity financing. UMF ¶ 64. Plaintiff consented to the Series A Investment and understood and agreed that, as a result, his percentage equity interest would be diluted and that his vesting period would change. UMF ¶ 66. Pursuant to the Amendment, Plaintiff's remaining 404,583 unvested shares would begin to vest in equal parts over the next 36 months beginning on November 30, 2021. UMF ¶ 65.

Plaintiff does not dispute that he signed an amendment to the Restricted Stock Purchase Agreement, but he asserts:

> As with the creation of the employee stock incentive pool, I was not consulted on any aspect of the decision to amend the stock purchase agreement. I had no input into the decision to seek outside funding, how that funding would be structured, how the equity given to the investors would be structured, or how the funding would impact the existing equity positions of the founders. I was simply given a document to sign. I did not believe that I had any choice in the matter. Indeed, it was clear to me that if I did not sign the amendment to the stock purchase agreement, my employment would be terminated.

Doc. 40-1 at 4-5.

As a result of issuing stock to the new investors in connection with the Series A Investment, the percentage equity interest of all existing shareholders, including Plaintiff's, was diluted proportionately; the stockholders consented to this dilution. UMF ¶ 68. Plaintiff received $65,000 from Defendant upon closing of the Series A Investment pursuant to the terms of his Employment Agreement. UMF ¶ 69.

F.    Termination of Employment

On October 21, 2021, Rahul Shendure, CEO of CarbonBuilt, notified Plaintiff that his employment with Defendant had been terminated. UMF ¶ 70. Though Shendure deemed Plaintiff's performance to be unsatisfactory prior to closing the Series A Investment, Defendant did not terminate Plaintiff until after the Series A Investment closed so that Plaintiff could be paid $65,000 of his salary, as provided in his Employment Agreement. UMF ¶ 72. (Plaintiff

disputes that his performance was unsatisfactory, but does not dispute that Defendant terminated him for this stated reason. Doc. 40-1 at 5.) Pursuant to the terms of the RSPA as amended, Plaintiff was not entitled to any further vesting of his unvested shares following his termination. UMF ¶ 73. The company exercised its right to repurchase the unvested shares and issued payment to Plaintiff for same. UMF ¶ 74. On May 10, 2022, more than six months after Plaintiff was terminated, Defendant exercised its option and obtained the exclusive license to use and commercialize the UCLA Tech from the Regents of UCLA ("License"). UMF ¶ 75.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted).

Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.* But, "the plain language of Rule 56(c) mandates the entry

of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. When "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is "entitled to a judgment as a matter of law." *Id.* at 323. Therefore, "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The movant may show an entitlement to summary judgment "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.*

## DISCUSSION

Defendant argues that it is entitled to summary judgment on claims that arose prior to June 1, 2021, because Plaintiff released them. Defendant further argues that it is entitled to summary judgment for claims which arose after that date because Plaintiff has no evidence Defendant breached a contract or other enforceable promise when it diluted Plaintiff's 8.42% equity share in CarbonBuilt and terminated his employment. The Court considers each argument in turn.

## I.    Claims arising out of Plaintiff's work performed for Defendant before June 1, 2021

Plaintiff's primary argument on summary judgment is that he was not compensated for work he performed for Defendant between November 2018 and October 2020. When Plaintiff executed his employment contract with Defendant, he released all claims "arising out of, based upon or in any way related to [his] service to [Defendant] or otherwise relating to [his] role or

status with [Defendant] on or prior to the Start Date." Doc. 29-3 at 42. The Start Date was defined as June 1, 2021. Doc. 29-3 at 41. Defendant's release argument is simple: Based on this clear and unambiguous language, Plaintiff released all claims he could have brought for uncompensated work he performed before June 1, 2021, which by definition, includes the period between November 2018 and October 2020.

In response, Plaintiff argues that "the purpose of the release was to cover the work Plaintiff did during the 'Pre-Employment Period.'" Doc. 40 at 10. Plaintiff points out that the release paragraph begins by stating: "You acknowledge that the Company's obligations under state and federal minimum wage laws to pay you wages for services you rendered to the Company during the Pre-Employment Period are uncertain and you agree that you and the Company will benefit from a resolution of claims you may have to unpaid compensation during the Pre-Employment Period." Doc. 29-3 at 42. In turn, the contract defined the "Pre-Employment Period" as work performed between November 4, 2020 and June 1, 2021.[5] Doc. 29-3 at 41.

Plaintiff further argues that "[t]he amount Defendant paid to Plaintiff to release any pre-employment claims further supports the conclusion that the release was limited to claims related to the Pre-Employment Period." Doc. 40 at 11. The $75,833.33 Defendant promised to pay Plaintiff upon the closing of equity financing was, at least in part, consideration for the release Plaintiff signed. Doc. 29-3 at 41. The Pre-Employment Period consisted of 7 months (November 4, 2020 to June 1, 2021). The sum of $75,833.33 is equivalent to 7 months of the $130,000.00 salary at which Defendant agreed to employ Plaintiff in the same Employment Agreement. Doc. 29-3 at 41. Plaintiff therefore argues the release applies only to claims for work performed

---

[5] Recall that November 4, 2020 is that date Bruin Industries, Inc., CarbonBuilt's predecessor, was formed.

during the defined "Pre-Employment Period" and does not encompass work Plaintiff performed before November 4, 2020. To the extent what period the release applies to is ambiguous, Plaintiff argues this ambiguity in the Employment Contract should be resolved against Defendant, who Plaintiff alleges drafted the contract. Doc. 40 at 12-13. At a minimum, Plaintiff asserts, this ambiguity creates an issue of fact that cannot be resolved on summary judgement. Doc. 40 at 13.

The Court agrees with Plaintiff that, when interpreting the contract, every provision should be given meaning. The Court also agrees with Plaintiff that the contract states the one-time payment of $75,833.33 was for the Pre-Employment period. This one-time payment, however, does not comprise the entire consideration Plaintiff received for the release. Consider the entire relevant paragraph of Plaintiff's Employment contract:

> Commencing on your Start Date, you will be paid a signing bonus of $10,833.33 and you will be entitled to receive a salary of $130,000 per year, of which $65,000 per year will be paid to you in accordance with the regular payment practices of the Company and $65,000 per year will accrue until the Initial Equity Financing (as defined below). The accrued portion of your salary will be paid to you upon the closing [sic] the Company's initial equity financing transaction or series of related financing transactions with one or more third party investors resulting in proceeds to the Company of at least $5,000,000 ("Initial Equity Financing"), but not later March 15, 2022; provided, however, if the closing of the Initial Equity Financing does not occur on or before March 15, 2022 and payment of such accrued portion of your salary would impair the Company's ability to continue as a going concern within the meaning of Treasury Regulation 1.409A-1(b)(4)(ii), then the Company may defer such payment until such a time a payment would not cause such impairment. In addition, *in consideration of the release set forth in paragraph 4 below*, you will be paid a one-time payment of $75,833.33 which shall constitute payment of any unpaid compensation during the period from November 4, 2020 to the Start Date (the "Pre-Employment Period"), which amount shall be paid to you upon the closing of the Initial Equity financing, *plus an additional $5,416.67 for each calendar month* or portion thereof that elapses between the Start Date and the closing date of the Initial Equity Financing, provided you remain continuously employed by the Company through the closing of the Initial Equity Financing. Following the closing of the Initial Equity Financing, your salary shall increase to $135,000 per year, which shall be paid in accordance with the payment policies and procedures of the Company.

Doc. 29-3 at 41-42 (emphasis added; emphasis in original removed).

This contract indicates that Plaintiff would receive three payments no later than the time of Initial Equity Financing (or March 15, 2022, whichever was earlier): (1) $75,833.33 to account for work done between November 4, 2020 and June 1, 2021 (Plaintiff's Start Date); (2) $5,416.67 per month ($65,000 per year) for work performed from the Start Date until Initial Equity Financing; and (3) whatever portion of a $65,000 annual lump sum had accrued at the time of Initial Equity Financing or March 15, 2022. Of these payments, enumerated items (1) and (2) are explicitly listed as consideration for the Release. That is, in exchange for the release, in addition to the $75,833.33 Plaintiff would receive for his past work, he also received a contract of future employment for a specific salary. Viewed as a whole, the contract essentially stated: In consideration of a one-time payment for work done between November 4, 2020 to June 1, 2021, and of future employment at this salary provided, Plaintiff releases all claims against Defendant arising before June 1, 2021.

An upshot of this agreement is that Plaintiff is precluded from filing a claim for work he performed before November 4, 2020. That is, implicit to the deal Plaintiff reached is that, in exchange for (1) getting paid a certain amount for work performed from November 4, 2020 to June 1, 2021, and (2) getting paid a certain amount for future work, Plaintiff agreed to:

> release[s] and forever discharge[s] and agree[s] to hold harmless [Defendant] from any and all demands, claims, duties, actions, obligations or causes of action, assessments, losses, damages, liabilities, costs and expenses (including attorneys' fees) of any kind, nature or description (including, without limitation, any claim of unpaid wages, salary, bonuses or fees for services rendered), interest, penalties, whether known or unknown, suspected or unsuspected, fixed or contingent that [Plaintiff has] or may have, now or in the future, against [Defendant] arising out of, based upon or in any way related to [his] service to [Defendant] or otherwise relating to [his] role or status with [Defendant] on or prior to the Start Date.

UMF ¶ 57. Whether this was a good deal or a bad deal for Plaintiff is beyond the Court's purview.

Even if the release did not apply to the period between November 2018 and October 2020, however, Plaintiff's claims would still fail. Plaintiff's claims for work performed before November 2020 fall into two separate categories: contract and quantum meruit. Doc. 1-1 at 12-14. Plaintiff has not met his burden to present evidence through which a reasonable jury could find in his favor on either cause of action. *Cf. Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (movant may show an entitlement to summary judgment "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim").

First, the Court agrees with Defendant that there was no contract promising Plaintiff compensation at a certain level for work performed before November 2020. Doc. 25 at 18. Plaintiff relies heavily on the December 2019 email, but that email was not a binding offer that would form a contract if Plaintiff accepted it. The parties do not dispute the email consisted of "initial thoughts" and contained no binding language or signatures. The email proposed a corporate structure and equity distributions but made it clear that there was no agreement at that time—even regarding the "guiding principles" or "broad basis" of the proposal, much less regarding the ultimate value of each person's share in the company.[6] UMF ¶ 25c; Doc. 29-2 at 5-6; *Bd. of Educ., Gadsden Indep. Sch. Dist. No. 16 v. James Hamilton Const. Co*., 1994-NMCA-168, ¶ 19, 891 P.2d 556, 561 (a promise that leaves it entirely in the discretion of one party whether to perform the promise or not is illusory and not a legally binding contract).[7]

---

[6] Because there was no binding promise or contract the Court need not address whether an email from Gustav Sant, sent before CarbonBuilt came into existence, could bind CarbonBuilt under a theory that it is the successor to Sant's individual legal obligations.

[7] The parties do not brief choice-of-law issues and rely on New Mexico law in their briefing before the Court. The Court likewise cites New Mexico law.

Regarding Plaintiff's quantum meruit claims, the Court notes Plaintiff did receive compensation for the work he did from November 2018 (when Plaintiff claims he began performing worked that inured to the benefit of CarbonBuilt) to November 2020 (when Plaintiff received CarbonBuilt stock). Doc. 29 at 25. Plaintiff does not dispute that the shares he was given in CarbonBuilt in November 2020 were intended to serve as compensation for the co-founders' participation in early work on the UCLA project which ultimately inured to Defendant's benefit. UMF ¶ 33. And, although Plaintiff complains that the value of these shares was diluted, he acknowledges that, even after dilution, he maintained slightly less than a 2% equity stake in the company. Doc. 40 at 18. How much is this 2% equity stake worth? The Court does not know as the record contains no estimate. Plaintiff also does not dispute that, when Defendant terminated his employment, it exercised its right to repurchase his unvested shares and paid him for those shares. UMF ¶ 74. How much did he receive? Again, Plaintiff does not say. Given that Plaintiff indisputably received some compensation for the work he did from November 2018 until he received his CarbonBuilt stock in November 2020, the most relevant question related to his quantum merits claims is whether what he received was enough under the circumstances.

That is because "[a] claim for restitution is distinct from a contract claim. It is rooted in principles of quasi-contract or quantum meruit, and its principal objective is to prevent unjust enrichment." *Credit Inst. V. Veterinary Nutrition Corp.*, 2003-NMCA-010, ¶ 21, 62 P.3d 339, 344. Plaintiff admits that he received compensation for his work on the UCLA Tech. UMF ¶ 10. His claim, therefore, is not that Defendant failed to compensate him at all; rather, he alleges that Defendant did not compensate him enough because although it gave him equity in the company, it continued to dilute that equity unjustly. Doc. 40 at 18.

But to prevail on this claim at trial, Plaintiff would have to present evidence that the value of his services (either the cost to him or the market value of those services) exceeded the amount Defendant compensated him. *See* Restatement (Third) of Restitution and Unjust Enrichment § 49 (2011) (setting forth different methods of calculating the value of nonreturnable benefits such as services rendered). Plaintiff does not present any such evidence. Plaintiff alleges (without evidence) that he ended up with slightly less than a 2% equity stake in the company, Doc. 40 at 18, but provides no evidence either of the monetary value of this 2% nor the monetary value of his services to the company. Similarly, Plaintiff fails to present evidence that the value of the 2% equity stake in the company he retained, combined with money he received from the repurchase of his unvested shares, is insufficient to compensate him for the work he performed from November 2018 through October 2020.[8] Nor has Plaintiff presented any evidence to rebut Defendant's evidence that the shares in CarbonBuilt Plaintiff received were intended to serve as compensation for the co-founders' participation in early work on the UCLA project which ultimately inured to Defendant's benefit. UMF ¶ 33. Therefore, the Court finds that Plaintiff lacks evidence to establish an essential element of his claim for unjust enrichment.

For these reasons, the Court grants summary judgment on the claims arising out of his work performed for Defendant prior to November 2020.

## II.     Claims for actions taken after June 1, 2021

Neither party argues that Plaintiff released claims for actions Defendant took after June 1, 2021. The Court therefore considers these arguments in a separate discussion. Plaintiff argues Defendant took two actions after June 1, 2021 for which he is entitled to compensation: (1) Defendant diluted his equity stake in CarbonBuilt, which breached his contract with Defendant,

---

[8] Plaintiff acknowledges he was paid for work he performed after November 4, 2020.

constitutes a violation of the covenant of good faith and fair dealing, and constitutes a prima facie tort; and (2) defendant terminated his employment on October 21, 2021, which constitutes a prima facie tort. Doc. 40 at 13.

A.    Equity dilution

Plaintiff argues Defendant committed a prima facie tort, breached a contract, and breached the covenant of good faith and fair dealing when it diluted his equity through the employee stock incentive pool and the Series A investment. Doc. 40 at 15-16. To the extent Plaintiff challenges the creation of the stock incentive pool, his act of releasing all claims against Defendant for acts done before June 1, 2021, bars Plaintiff's claim. This is because Defendant created the stock incentive pool three weeks earlier, on May 10, 2021. Doc. 29 at 20; Doc. 29-3 at 36. Therefore, this event is covered by the release of all claims against Defendant arising before June 1, 2021.

In contrast, the Court agrees with Plaintiff that his release for acts done before June 1, 2021, does not apply to the Series A investment that closed with an execution to an amendment to Plaintiff's RSPA on September 15, 2021. UMF ¶ 64. The Court therefore addresses the merits of this claim and concludes that it is without merit. The basis of Plaintiff's claim is that Defendant promised him a specific equity share in the company as compensation for work he performed before the company existed. Doc. 40 at 14. Plaintiff asserts this promise is contained in the December 2019 email. Doc. 40 at 15 ("In December 2019, Dr. Sant more specifically offered to Plaintiff an 8.25% equity stake in whatever company would be formed to

commercialize the technology.").[9] As discussed above, this email is not an enforceable contract offer or promise.

Even if the December 2019 email were an enforceable promise, however, the promise clearly contemplates an equity share that could and would be diluted. First, it specifically provided for an equal reduction in each founder's equity stake with new infusions of capital. Doc. 29-2 at 5 ("***Equivalent reductions following cash infusion***: Following a cash infusion (i.e., securing dilutive funding), everyone takes an equivalent reduction in equity, i.e., in proportion to their pre-dilutive funding equity holding, and the equity that is surrendered to the investor."). Second, it contemplated that some equity would be used for a "strategic pool" to "incentivize new personnel additions." *Id*. That is, the two actions on which Plaintiff bases his equity dilution claim are actions the December 2019 email explicitly contemplated Defendant taking. Thus, assuming the December 2019 email is an enforceable promise, the undisputed facts show Defendant held up every material aspect of this promise, from granting Plaintiff an 8.25% equity share to distributing equity to employees and new investors upon infusions of capital (which had the contemplated effect of reducing the equity share of preexisting equity holders like Plaintiff).

Plaintiff nonetheless argues that, "Had Defendant chosen to do so, it could have both created the employee equity pool and obtained financing without causing Plaintiff's interest in the company to dip below 8.25%. It would simply have required Dr. Sant, Mr. Shendure, or Mr.

---

[9] Plaintiff also states that, on an unspecified date prior to CarbonBuilt's incorporation, "he was assured that, in exchange for his efforts, he would be given a significant equity share in whatever company would be formed to accomplish that commercialization [of the UCLA Tech]." Doc. 40 at 14. Plaintiff fails to establish that such a general and undefined assurance constituted a contract or enforceable promise. In addition, even assuming this alleged assurance constituted an enforceable promise, Plaintiff fails to demonstrate Defendant breached any promise to provide Plaintiff a significant equity share in whatever company would be formed. Defendant, indisputably gave Plaintiff equity in the company formed to commercialize UCLA Tech and Plaintiff has failed to present evidence that the share he was given is insignificant.

Muller (or some combination thereof) to make up the difference." Doc. 40 at 15. This is a true statement on its face; Defendant could indeed have reduced the other founders' equity upon issuing new stock and preserved the percentage value of Plaintiff's share in the company. The problem with Plaintiff's argument, however, is that he identifies no source of a legal duty that required Defendant to prioritize Plaintiff's equity share at the expense of the other founders.

As Defendant points out, the December 2019 email stipulated that *all founders'* percentage equity would be reduced proportionately upon a cash infusion. There is simply no evidence Defendant ever promised, or incurred any other type of obligation, that would require it to preserve Plaintiff's equity share at the expense of the other founders' shares. (And to the extent that Plaintiff argues Defendant was required to take such an action to compensate him for the work performed from November 2018 to October 2020 under a theory of quantum meruit/unjust enrichment, that claim fails for the reasons discussed above.) The Court therefore grants Defendant summary judgment on Plaintiff's claims to the extent they are based on actions taken during his employment that resulted in the dilution of his equity.

B.    Termination

Plaintiff also argues Defendant committed a prima facie tort by "the pretextual termination of Plaintiff's employment to prevent him from fully vesting the smaller equity stake Defendant forced on Plaintiff." Doc. 40 at 16. The elements of a prima facie tort are (1) an intentional act, (2) committed with the intent to injure the plaintiff, (3) causing injury to the plaintiff, and (4) the absence of justification. *Grover v. Stechel*, 2002-NMCA-049, ¶ 19, 45 P.3d 80, 85.

The New Mexico Supreme Court has instructed that, before applying the doctrine of prima facie tort, district courts must "determine whether [invoking the prima facie tort doctrine] is justified by comparing the plaintiff's claim to other established intentional torts and

20

determining what privileges the defendant would be able to claim if the plaintiff was proceeding

under an established intentional tort." *Beaudry v. Farmers Ins. Exch.*, 2018-NMSC-012, ¶ 13,

412 P.3d 1100, 1104. "A judge must also engage in this comparison process to make certain that

the plaintiff's prima facie tort claim is not being used to evade stringent requirements of other

established doctrines of law." *Id.* (quotation marks omitted). "[W]hen the prima facie tort claim

is 'closely related to an established tort,' the court should apply the privileges and defenses that

would exist if the plaintiff was proceeding under the established tort claim." *Id.* (quoting the

Restatement (Second) of Torts § 870 cmt. j).

      The *Beaudry* court held that "prima facie tort" cannot be used to challenge a defendant's

decision to terminate an agency/employment agreement where the corresponding breach of

contract claim failed on the basis that the contract expressly permitted defendant to terminate the

relationship. *Id.* ¶ 1. *Beaudry* likely resolves Plaintiff's claim here because the employment

contract in this case expressly permitted Defendant to terminate the employment for cause (such

as dissatisfaction with Plaintiff's performance), or for no cause at all. Doc. 29-3 at 43 ("[E]ither

you or the Company will be entitled to terminate your employment at any time and for any

reason with or without cause.").

      Plaintiff acknowledges that his contract states his employment was at will, but argues that

New Mexico law recognizes certain exceptions to the "at will" doctrine. Doc. 40 at 17. "New

Mexico recognizes two exceptions to the doctrine of at-will employment: breach of implied

contract and retaliatory discharge." *Whittington v. State Dep't of Pub. Safety*, 2004-NMCA-124,

¶ 17, 200 P.3d 209, 215. Plaintiff does not argue retaliatory discharge. That leaves breach of

implied contract. Again, however, Plaintiff's only source of an implied contract seems to be the

December 2019 email. Doc. 40 at 17 ("Defendant was under a contractual obligation to

compensate Plaintiff with an 8.25% equity share of, ultimately, CarbonBuilt."). As explained

above, even if this email is a contract or implied contract, it established at most that Plaintiff

would have an 8.25% equity share in the initial stock distribution, subject to dilution upon the

occurrence of certain events. It was not a promise to continue Plaintiff's employment

relationship with Defendant indefinitely, and it was not a promise to grant him 8.25% of the

company in perpetuity. The Court therefore grants Defendant summary judgment on Plaintiff's

claims to the extent they are based on his termination.

<u>**CONCLUSION**</u>

The Court GRANTS Defendant's Motion For Summary Judgment Or In The Alternative,

Summary Adjudication, Doc. 29. Defendant is granted summary judgment on all claims in

Plaintiff's complaint. A separate order of judgment will follow.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE